Filed 8/20/25  P. v. deGeorge CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN E. deGEORGE,<br><br>    Defendant and Appellant. | H051611<br>(Monterey County<br>Super. Ct. No. CR6768) |

Defendant Juan deGeorge pleaded guilty to second degree murder and robbery in 1979.  In 2022, he petitioned for resentencing under Penal Code section 1172.6.  Following an evidentiary hearing, the trial court denied his petition.  On appeal he contends the evidence at the hearing was insufficient to establish that he was a major participant in the underlying robbery who acted with reckless indifference to human life and was thus guilty of felony murder under current law.  For the reasons explained here, we will affirm the order denying his petition.

## I.    TRIAL COURT PROCEEDINGS

In 1979, when defendant was 21 years old, he and accomplice Steven Holt committed an armed robbery that resulted in the victim's death.  Defendant pleaded guilty to second degree murder and robbery and was sentenced to 15 years to life in prison on the murder count.  He then testified at Holt's 1980 special circumstances murder trial.

## A. TRIAL TESTIMONY

Defendant testified that he lived next to Holt in February 1979. On February 8, he drove Holt from Monterey to a house in Seaside, where Holt obtained a gun that he planned to use for a robbery. Defendant dropped Holt off in Monterey, and Holt told defendant to pick him up again later that night. Around 5:30 or 6:00 p.m., defendant picked up Holt and the two discussed committing a robbery together. Holt had a gun, but defendant did not; defendant "wanted a gun, too," so they returned to Seaside and bought him one. Both guns were loaded.

While defendant drove Holt back to Monterey, they discussed robbing a particular gas station but decided "it was too open." There was a restaurant across the street from the gas station and "too much traffic in and out all the time." Holt proposed robbing Troia's Market instead because he knew "the manager there always took money home, a lot of money at night." Defendant and Holt wanted "a large amount of money" to "get drugs."

Defendant asked Holt, " 'What are you going to do? Just run in there and stick it up? How are we going to do it?' " Holt explained that "one of the two owners" usually "left with a big bag of money every night" when the market closed at 7:00 p.m. He said they could "run up, flash a gun, and the person would give up the money."

It was almost 7:00, so defendant "drove past the market" and "saw that the lights in the market in the back were already off and that the people were doing their last minute things before they left." He parked the car nearby and he and Holt walked to a parking lot, where they waited for it to get darker. They then waited next to a picket fence "for maybe three to five minutes" until defendant "saw a man come into the parking lot of Troia's Market and get into a little red truck." Defendant "started to come around the corner" but Holt waved him off, saying, " 'don't go. That's not the man.' " Defendant then saw "another man walking on the street" carrying a black vinyl bag.

2

As the man was bending over to unlock his car, Holt told defendant to " 'go ahead' " with the robbery. Defendant walked up behind the man and "tugged on" the bag he was holding. The man tightened his grip on the bag, turned around, and said something like, " 'What's going on?' " Defendant heard a gunshot, turned around, and saw Holt standing behind him with a gun in his hand. He turned back and saw the man on the ground, "curled up a little bit" with his head on the sidewalk and the rest of his body in the street. Defendant stepped over the man to pick up a bag of money the man had dropped, then ran away to his car. He heard the man yell in pain and say, " 'You son of a bitch. You didn't have to shoot me.' "

When defendant got to his car, he noticed his gun was cocked; he remembered taking it out of his belt during the robbery but did not remember cocking it. Defendant turned the car on and waited for Holt, who arrived about 30 seconds later. He gave Holt his gun, which Holt put in the glove compartment. Holt said, " 'I hope I didn't kill the man' " and " 'I hope I shot him in the leg or the arm or something.' " They drove to Seaside, where they divided the money from the bag and bought drugs. After using the drugs, they learned from watching the news that Sam Troia of Troia's Market had died in the robbery. Defendant told Holt they "had to be real careful" or they were "going to get caught."

B. **RESENTENCING PROCEEDINGS**

In 2022, defendant petitioned for resentencing under Penal Code section 1172.6 (formerly Penal Code section 1170.95; unspecified statutory references are to the Penal Code). The prosecution conceded that defendant had stated a prima facie case for resentencing, and an evidentiary hearing was held in 2023. Defendant's testimony at Holt's trial was admitted into evidence at the hearing.

1. **Defendant's Testimony at the Evidentiary Hearing**

Defendant testified at the hearing that he had known Holt for about 30 days at the time of the robbery. Defendant had driven Holt to buy drugs in Seaside "a couple of

times" and started using drugs with Holt about a week before the robbery. They had committed a few burglaries together without using weapons, where they would break into houses, steal stereos, and sell the stereos for money they would then use to buy drugs. Defendant was not aware of Holt's reputation in the community and had never seen Holt act violently, whether sober or under the influence of drugs. By himself, defendant had committed two previous robberies; he carried a hammer to scare the victims but had not intended to use it.

On the morning of February 8, Holt asked defendant to drive him to Seaside to buy drugs. They drove to a house where Holt bought heroin and shared it with defendant. Later that day, between 3:00 and 4:00 p.m., they were "driving around" when Holt proposed robbing Troia's Market. Holt explained that he had worked at the market and knew someone would "leave with the money" at 5:00 p.m. When defendant asked how they would get the money, Holt mentioned "a hedge right there behind Troia's" and told defendant, "We stand right there. You run out, grab the money, and you take off to the car. And I'll be right behind you."

Holt directed the planning process and defendant went along with it. They went to a house in Seaside, where Holt got two guns they would use to scare Troia. Holt told defendant there would not be any problems and no one would get hurt. Defendant knew his gun was loaded, but the gun was not cocked when Holt gave it to him. They parked near Troia's Market around 5:15 or 5:30 p.m., got out of the car, and waited behind the hedge. When Troia passed the hedge, defendant "ran out" behind him and "snatched" a briefcase Troia was carrying; defendant "smashed it" and "pulled." Troia reacted and defendant "went back." Defendant heard a gunshot and saw Troia "laying on the ground." He turned around and asked Holt, who was standing behind him, " 'What the hell did you do?' " Defendant picked up Troia's bag and ran away. Some of the bag's contents had fallen on the ground, and defendant "might have tried to scoop something

4

up," but he was "scared to death" and left quickly without checking to see whether Troia was okay. He ran to the car and turned it on.

When Holt got in the car about a minute later, defendant asked him, "What the fuck did you do?" Holt replied that he "didn't mean to do that" and hoped Troia was "okay." They drove to Seaside, used heroin together, and learned from watching the news that Troia had died. Defendant acknowledged having said at a 1997 parole hearing, " 'I had the chance to say yes or no. I accept full responsibility. It was my fault. I could have stopped him.' "

### 2. Psychological Testimony

A psychologist testified that the human brain "starts rapidly changing and developing" at the age of 12, pushing adolescents toward "risk taking, stimulation-seeking types of behavior." Conversely, "social and emotional development is known to lag many years behind one's cognitive development." A lack of "emotional maturation" may "impede a person from making good, moral judgments, decisions beyond what feels good or what one's friends are doing at the time."

Although adolescence ends and "emerging adulthood" begins when a person turns 19 years old, "actual brain development" is "totally fluid." "There really is no difference between an 18-year-old and a 19-year-old" and "not necessarily a whole lot of difference between a 17-year-old and a 20-year-old with respect to brain development." Traumatic experiences or substance use can affect an adolescent or emerging adult's ability to emotionally self-regulate. People between 18 and 22 years old do not have fully developed prefrontal cortexes, which affects "emotional self regulation, problem solving, decisionmaking, and judgment and inhibition of impulses in addition to anticipating the long-term or even the future consequences of their conduct." A lack of brain development may affect a person's "ability to reasonably foresee and anticipate the outcome of conduct."

5

"People understand the difference between right and wrong by the age of 16" in that they are able to understand what behavior will violate the law or get them in trouble. Moral reasoning and judgment is more complicated and can be affected by factors such as childhood trauma or cultural influences. Absent substantial trauma, a person would usually "have some clarity in their moral reasoning" by the age of 21 and would likely consider it morally wrong to watch someone die without providing assistance.

### 3. The Court's Ruling

The court denied the petition, finding beyond a reasonable doubt that defendant was a major participant who acted with reckless indifference to human life. The court noted that defendant had committed other armed robberies as a juvenile, although those cases did not involve firearms; he was armed in this instance with a gun; participated in preparing for and discussing the robbery; and used his own car to drive Holt between Seaside and Monterey. Although there were "minor inconsistencies" between defendant's testimony at the hearing and his earlier testimony at Holt's trial, the court found defendant's testimony credible and attributed any inconsistencies to the passage of time and not an attempt by defendant "to mitigate anything or shade anything or not be completely truthful." The trial court also commented that after observing defendant's hearing testimony, it found him "sincere and remorseful."

## II.   DISCUSSION

Defendant challenges the trial court's finding that he was guilty of felony murder under current law, arguing the evidence is insufficient to show that he was a major participant who acted with reckless indifference to human life. We conclude the record contains sufficient evidence to support that finding and we will therefore affirm the denial of the resentencing petition.

### A. LEGAL BACKGROUND AND STANDARD OF REVIEW

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 2), which amended sections 188 and 189 to "eliminate[] natural

6

and probable consequences liability for murder as it applies to aiding and abetting, and [to] limit[] the scope of the felony-murder rule." (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) That change in law resulted in three amendments to the Penal Code, effective January 1, 2019. First, section 188, subdivision (a)(3) was added so that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought" and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Second, section 189, subdivision (e) was added to limit liability for felony murder. (Stats. 2018, ch. 1015, § 3.) Third, Senate Bill No. 1437 added former section 1170.95, "which create[d] a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis*, at p. 957.) Specifically, "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition … to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts" under certain conditions. (Former § 1170.95, subd. (a) (Stats. 2018, ch. 1015, § 4).)

Section 1172.6, subdivision (a) allows a defendant convicted of murder to petition for resentencing if, as relevant here, a "complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder" (§ 1172.6, subd. (a)(1)) and the defendant "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019" (§ 1172.6, subd. (a)(3)). An order to show cause must issue if a petitioner makes a prima facie case for relief. (§ 1172.6, subd. (c).) At an evidentiary hearing on the order to show cause, the prosecution must prove beyond a reasonable doubt that the defendant is guilty of murder under current law. (§ 1172.6, subd. (d)(3).) We review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under that standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is

7

reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.)

## B. SUFFICIENCY OF THE EVIDENCE

Before the passage of Senate Bill No. 1437, any killing committed in the course of certain inherently dangerous felonies constituted first degree felony murder for which all participants in the underlying felony were strictly liable no matter their individual mental states. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) Now, only an actual killer or an aider or abettor who was "a major participant in the underlying felony and acted with reckless indifference to human life" is guilty of felony murder. (§ 189, subd. (e).) People like defendant who are not actual killers meet that definition "only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*); see § 189, subd. (e)(3).)

In his opening brief, defendant appears to argue only that the evidence was insufficient to support a finding that he acted with reckless indifference to human life, without challenging the trial court's finding that he was a major participant in the underlying robbery. In his reply brief, he argues against both findings. Although by failing to raise the issue in his opening brief defendant arguably forfeited his challenge to the court's finding that he was a major participant, we will nonetheless address his argument because the Attorney General raises the issue in the respondent's brief and because "the interrelationship between the two elements" is such that they frequently overlap. (*People v. Clark* (2016) 63 Cal.4th 522, 614–615 (*Clark*).) In assessing whether the evidence sufficiently established both elements, we will consider both defendant's testimony at the evidentiary hearing (which the trial court credited) and his earlier

testimony at Holt's trial (which, as the court noted, took place over 40 years earlier when defendant's memory of the crime was fresher). We also acknowledge defendant's age at the time of the robbery.

### 1. Major Participation

The California Supreme Court has identified the following factors as relevant to the analysis of major participation: (1) a defendant's role in planning the criminal enterprise leading to the death; (2) a defendant's role in supplying or using lethal weapons; (3) a defendant's awareness of any particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of co-participants; (4) a defendant's presence at the scene and actions (or inaction) that contributed to the death; (5) a defendant's ability to prevent or facilitate the killing; and (6) a defendant's actions after lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.)

Although it was Holt who proposed robbing Troia's Market, defendant acknowledged his involvement in planning the crime. Before defendant said at the evidentiary hearing that Holt had given him a gun for the robbery, he testified at Holt's trial that he had acquired a second gun because he did not want Holt to be the only one armed. Even if defendant did not know that Holt would act violently, he was aware that both guns were loaded and that the crime therefore presented a general risk of violence. As discussed in greater detail in our analysis of defendant's reckless indifference to human life, *post*, defendant was physically present at the scene and failed to aid a victim he knew had been shot and injured. Although defendant may not have been able to prevent the use of lethal force once the robbery was underway, he could have made efforts to prevent it during the planning process. And after Holt used lethal force, defendant took the victim's money, waited for Holt before driving away, and accompanied Holt to Seaside, where they used the proceeds from the robbery to buy drugs. Substantial evidence supports the trial court's finding that defendant was a major participant in the crime.

## 2. Reckless Indifference to Human Life

Determining whether a person acts with reckless indifference to human life requires consideration of five factors: (1) whether a defendant used a weapon or knew a weapon would be used; (2) whether a defendant was present at the crime and had an opportunity to constrain the crime or aid the victim; (3) the duration of the crime; (4) a defendant's knowledge of the likelihood of killing; and (5) a defendant's efforts to minimize the risk of violence. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) The California Supreme Court recently provided guidance regarding those factors in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), which also concerned a planned robbery that resulted in the victim's death, and concluded the evidence in that case was insufficient to support a finding of reckless indifference. We address the five *Clark* factors in the order they are discussed in *Clark* and in the parties' briefs, with due consideration of the Supreme Court's guidance in *Emanuel*.

With respect to the first *Clark* factor, we agree with defendant mere "awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618.) But the "*use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Ibid.*) Here the evidence showed that defendant specifically acquired a gun so both he and Holt would have one during the robbery; he knew both guns were loaded; and he removed the gun from his belt and cocked it while approaching the victim. That evidence could reasonably be viewed as supporting a finding of reckless indifference to human life. (Cf. *id.* at p. 619 [evidence "showed only that there was one gun at the scene," it was carried by an accomplice and not by the defendant, and that the gun was loaded with only one bullet]; *Emanuel*, *supra*, 17 Cal.5th at p. 885 [no evidence demonstrating that, prior to the robbery, the defendant knew his accomplice possessed a gun or would bring a gun to the planned robbery].)

10

The second *Clark* factor also supports a finding of reckless indifference. Defendant personally participated in executing the crime. While he may not have had an opportunity to prevent the shooting once the robbery was in progress, he had an opportunity to aid the victim after the shooting. Instead, he took the victim's money and fled. Arguing that his failure to aid the victim does not establish reckless indifference, defendant cites cases in which flight occurred under circumstances suggesting help was already on the way. (See *Clark*, *supra*, 63 Cal.4th at p. 620; *In re Moore* (2021) 68 Cal.App.5th 434, 452 (*Moore*); *In re Taylor* (2019) 34 Cal.App.5th 543, 559.) Likewise in *Emanuel*, the crime "occurred in the afternoon in a residential area adjacent to a public park"; the shooting was "followed immediately by screeching tires and the collision of [the victim's] truck with a tree"; and "numerous witnesses were nearby and heard the commotion," after which they called 911. (*Emanuel*, *supra*, 17 Cal.5th at p. 894.) "Sirens could be heard approaching shortly after the shooting and first responders arrived on the scene within minutes." (*Ibid.*) Here, by contrast, defendant had no reason to believe that help would soon be arriving to the scene, which the record indicates was chosen in part for being relatively free of traffic and bystanders. He nonetheless fled despite specifically knowing that Troia was still alive but injured. Under the circumstances, defendant's conduct immediately following the shooting supports a finding that he acted with reckless indifference during the robbery. (See *ibid.* [reckless indifference "must exist at the time of the underlying felony"].)

We acknowledge that the third and fourth *Clark* factors weigh against a finding of reckless indifference to human life. Although defendant and Holt spent time planning and preparing for the robbery, their interaction with the victim was very brief. (See *Clark*, *supra*, 63 Cal.4th at pp. 620–621; *Emanuel*, *supra*, 17 Cal.5th at p. 886; *Moore*, *supra*, 68 Cal.App.5th at p. 452.) And the trial court credited defendant's testimony, in which he clearly and consistently stated that he had no reason to believe Holt would shoot Troia. (See *Clark*, at p. 621 [fourth factor does not increase culpability where there

11

is no evidence the killer "was known to have a propensity for violence, let alone evidence indicating that [the] defendant was aware of such a propensity"].) That two factors weigh in defendant's favor, however, does not preclude a finding that he acted with reckless indifference.

The fifth and final *Clark* factor focuses on a defendant's efforts to minimize the risk of violence during the planning stage of the crime. (See *Emanuel*, *supra*, 17 Cal.5th at pp. 887–888.) Here, as the Attorney General argues, there is evidence that defendant *increased* the risk of violence by procuring a second loaded gun for the robbery. Defendant could have attempted to dissuade Holt from using a loaded gun; instead, he actively acquired a second loaded gun for his own use. "An individual who brings a loaded weapon to commit a crime runs the risk that the gun will discharge accidentally. A gunshot in such circumstances—whether accidental or intended—increases the risk that others will be injured, that people will panic, or that violence (with its own danger to those nearby) will be used in response." (*Dean v. United States* (2009) 556 U.S. 568, 576.) We reject defendant's contention that, "where a participant believes that the weapons will not be used and that they will only be there for show, there will be less need to take extra steps to ensure that such will be the case, for such steps have already been taken." An armed robbery in which loaded guns are carried, no matter the reason, is not analogous to an unarmed crime with less need to minimize the risk of violence. (Cf. *In re Scoggins* (2020) 9 Cal.5th 667, 683; *Emanuel*, at p. 887.)

Considering all five *Clark* factors in their totality and viewing the record in the light most favorable to the trial court's ruling as we must, we conclude substantial evidence supports the finding that defendant acted with reckless indifference to human life.

### 3. Relevance of Defendant's Youth

Defendant argues that "individualized considerations" including his "youth, background, and emotional development" at the time of the offense "weigh against" a

finding of reckless indifference. In assessing evidentiary sufficiency, we do not reweigh the evidence or second-guess credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) We have duly considered the factors identified by defendant, and they do not alter our conclusion that substantial evidence supports a finding of guilt under current law based on the totality of the circumstances.

Defendant emphasizes that he was only 21 years old at the time of the robbery. The cases defendant relies on involved significantly younger adolescent offenders. (See *People v. Keel* (2022) 84 Cal.App.5th 546, 562 [15 years old]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991 [15 years old]; *Moore*, *supra*, 68 Cal.App.5th at pp. 453–454 [16 years old]; *People v. Harris* (2021) 60 Cal.App.5th 939, 944–945 [17 years old].) Here a psychologist testified to both similarities and differences between adolescents 18 years old or younger and young adults like defendant. Although as defendant notes, the trial court made no express findings as to the relevance of defendant's youth or emotional development, the court was certainly aware of the psychologist's testimony and we presume it considered that testimony in making its findings. The court was also aware of aspects of defendant's background, such as his drug use and time previously spent in custody. None of those potential mitigators undermines the trial court's ultimate determination.

"In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence" and "we presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.) We see no reason to depart from that presumption here, as it was clear that defendant's youth in 1979 was a relevant consideration in determining whether he was guilty of felony murder under current law. (Cf. *id.* at pp. 1092–1093; *People v. Pittman* (2023) 96 Cal.App.5th 400, 416.) Substantial evidence supports the trial court's conclusion that defendant was guilty

13

beyond a reasonable doubt, and we therefore affirm the order denying his petition for resentencing.

## III.    DISPOSITION

The order is affirmed.

14

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.




_____

Wilson, J.



H051611
*The People v. deGeorge*